UNITED STATES DISTRICT COURT OFFICE
FOR THE DISTRICT OF MASSACHUSETTS

2004 JAN -8  A 11: 34

U.S. DISTRICT COURT

|  |  |
|---|---|
| JOSEPH L. KING, On Behalf of Himself And All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH and RONALD F. RICHARDS, | ) ) ) ) |
| Defendants. | ) ) ) ) |

CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS

04 10038 NG

MAGISTRATE JUDGE Alexander

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Biopure Corporation ("Biopure" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.       This is a federal class action on behalf of person who purchased or otherwise acquired the securities of Biopure between March 17, 2003 and December 24, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

AMOUNT $150      52988
SUMMONS ISSUED YES
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. F.O.M
1/8/04

2.     Biopure purportedly develops, manufactures and markets oxygen therapeutics for both human and veterinary use to treat and manage patients' oxygen requirements in a broad range of medical applications, including serving as an alternative to red blood cell transfusion to treat acutely anemic surgery and trauma patients, as an adjunct to cancer therapy, and as a means of preventing tissue damage and organ dysfunction resulting from heart attacks and strokes. On July 31, 2002, Biopure submitted a biological license application ("BLA") to the Food and Drug Administration ("FDA") seeking approval to market Hemopure in the United States to treat adult anemic patients undergoing orthopedic surgery. The Company had already obtained approval in South Africa to market Hemopure for the treatment of adult surgical patients who are acutely anemic and for the elimination, delay, or reduction of red blood cell transfusions in such patients. In September 2002, the Company received a grant from the U.S. Department of the Army to conduct clinical trials of Hemopure for the treatment of critically wounded soldiers. According to the Company's fiscal 2002 10-K, "[t]he Company has identified trauma as its next clinical development priority and is working with a committee of independent civilian and military trauma experts to broaden its trauma program." In March 2003, the Company submitted a "trauma study protocol" to the FDA in connection with its plans to conduct a Phase II clinical trial of Hemopure for the treatment of trauma patients.

3.     Unbeknownst to investing public, as early as March 2003, the FDA informed defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse event data submitted as part of the Company's BLA which sought FDA approval to market Hemopure to orthopedic surgery patients. This also put defendants on notice that FDA approval of the BLA, which would allow the first commercial

2

distribution, if any, of Hemopure in the United States, was in serious jeopardy and would be delayed beyond the time frames previously estimated by defendants.

4.    During the Class Period, defendants failed to disclose any of these adverse facts to the investing public, and materially misled investors concerning the commercial viability of Hemopure in the United States and the date by which marketing of Hemopure would commence, resulting in the artificial inflation in the price of Biopure's securities. Defendants were motivated to create such favorable conditions for Biopure's securities to complete two offerings of the Company's common stock during the Class Period, generating millions of dollars in proceeds and further, allowing certain Biopure insiders, including defendants Moore and Rausch, to sell hundreds of thousands of their personally held Biopure common shares to the unsuspecting public for proceeds of over $1.6 million.

5.    On December 24, 2003, the last day of the Class Period, after the market closed, defendants revealed in a press release that Biopure had received a Wells Notice from the SEC, indicating the staff's preliminary decision to recommend that the Commission bring civil injunctive proceedings against the Company. Defendants stated that they believed the notice was related to the Company's lack of disclosures regarding its communications with the FDA about the trauma study protocol and the BLA for Hemopure marketing in the United States. Further, defendants shocked the market when they disclosed that the FDA had halted further clinical trials of Hemopure due to safety concerns, thereby jeopardizing the marketability of the drug. Defendants also stated that they would respond to the FDA's concerns by mid-2004, thereby delaying the commercial release of Hemopure in the United States, if at all, beyond the mid-2003 target date defendants had previously stated.

3

6.     The market reacted swiftly and dramatically to these disclosures. On December 26, 2003, the price per share of Biopure common stock plummeted 13.83% from its previous trading day's closing price to close at $2.43 per share, a decline of over 70.5% from its Class Period high of $8.25 per share on or about August 21, 2003.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [ 17 C.F.R. § 240.10b-5].

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Biopure maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.    Plaintiff Joseph L. King, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Biopure during the Class Period and has been damaged thereby.

12.    Defendant Biopure develops and manufactures oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's

4

tissues. The Company's principal executive offices are located at 11 Hurley Street, Cambridge, Massachusetts 02141.

13.     Defendant Thomas A. Moore ("Moore"), at all relevant times, served as the Company's President and Chief Executive Officer.

14.     Defendant Carl W. Rausch ("Rausch"), at all relevant times, served as the Company's Vice Chairman and Chief Technology Officer.

15.     Defendant Ronald F. Richards ("Richards") at all times relevant to this action, served as the Company's Chief Financial Officer.

16.     The defendants referenced above in ¶¶ 13-15 are referred to herein as the "Individual Defendants."

17.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Biopure, by virtue of their high-level positions with the Company, directly

5

participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

6

Because of their Board membership and/or executive and managerial positions with Biopure, each of the Individual Defendants had access to the adverse undisclosed information about Biopure's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Biopure and its business issued or adopted by the Company materially false and misleading.

21.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Biopure common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Biopure's business, operations, management and the intrinsic value of Biopure common stock; (ii) allowed the Company to sell its common shares generating more than $30.6 million in proceeds (iii) enabled the Individual Defendants and other insiders to sell more than $1.6 million worth of their personally-held shares of Biopure common stock at artificially inflated prices; and (iv) caused

plaintiff and other members of the Class to purchase Biopure securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Biopure between March 17, 2003 and December 24, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Biopure common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Biopure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

8

27.    Common questions of law and fact exist as to all members of the Class
and predominate over any questions solely affecting individual members of the Class. Among
the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by defendants'
acts as alleged herein;

b.    whether statements made by defendants to the investing public
during the Class Period misrepresented material facts about the business, operations and
management of Biopure; and

c.    to what extent the members of the Class have sustained damages
and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and
efficient adjudication of this controversy since joinder of all members is impracticable.
Furthermore, as the damages suffered by individual Class members may be relatively small, the
expense and burden of individual litigation make it impossible for members of the Class to
individually redress the wrongs done to them. There will be no difficulty in the management of
this action as a class action.

## SUBSTANTIVE ALLEGATIONS

29.    On March 17, 2003, the first day of the Class Period, Biopure filed its
quarterly report on Form 10-Q for the period ending January 31, 2003, signed by defendant
Richards. The Form 10-Q reported that the Company had a net loss of $0.36 per share during the
first quarter fiscal 2003 compared to a net loss of $0.38 for the same period last year. In
addition the Form 10-Q included the following representations concerning the Company's
Hemopure research and development efforts, stating in pertinent part as follows:

9

Research and development expenses continue to include amounts for support of
the BLA review process including responding to FDA inquiries, preparing for and
participating in FDA inspections of facilities and documentation and preparing for
a possible FDA Advisory Panel presentation. These BLA support costs were
$2,232,000 for the first fiscal quarter of 2003 and are expected to continue at
approximately the same level *until the middle* of *this calendar year, when the*
Company is *hopeful that it will receive action by the FDA on the BLA.*

\* \* \*

*If the FDA were to grant marketing approval for Hemopure this calendar year,*
*we anticipate that we would have material revenues from this project in fiscal*
*2004. We do not anticipate that we will attain profitability, however, until we*
*are able to increase our manufacturing capacity. There are substantial risks*
*and uncertainties relating to whether and when we will obtain FDA approval*
*for Hemopure, the timing of the construction of additional capacity and other*
*factors that may affect our ability to generate a profit from our research and*
*development of Hemopure.* [Emphasis added.]

30.    On March 25, 2003, defendants issued a press release announcing the

completion of a public offering of 5,548,480 shares of Biopure common stock for total proceeds

of $13.4 million.  The press release stated in pertinent part as follows:

Biopure sold all of these shares to a group of investors under a shelf registration
statement previously filed with and declared effective by the U.S. Securities and
Exchange Commission. Investors included Biopure Vice Chairman David N.
Judelson, President and CEO Thomas A. Moore and a major stockholder, HTV
Industries, Inc., and its affiliates, who purchased an aggregate of $2.3 million of
stock. The company also issued the group of investors warrants to purchase an
aggregate of 1,109,696 shares of common stock at $3.63 per share, which if
exercised would provide Biopure with additional net proceeds of approximately
$4.0 million.

\* \* \*

Hemopure(R) [hemoglobin glutamer - 250 (bovine)] is approved in South Africa
for the treatment of adult surgical patients who are acutely anemic and for the
purpose of eliminating or reducing the need for allogenic red blood cell
transfusion in these patients. Biopure's application to market Hemopure in the
United States for a similar indication in adult patients undergoing elective
orthopedic surgery is currently being reviewed by the U.S. Food and Drug
Administration[...]

\* \* \*

The previously announced $4.9 million in FY02/03 Congressional appropriations
administered through the U.S. Army and anticipated $4 million in U.S. Navy

funding from a Cooperative Research and Development Agreement (CRADA)
for clinical trials of Hemopure in trauma are project-specific funds independent
from Biopure's reported cash on hand. Completion of the pivotal RESUS
clinical trial of Hemopure in trauma is contingent upon further funding.
$908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which
the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street,
Fort Detrick MD 21702-5014 is the awarding and administering acquisition
office.

31.    On May 22, 2003, defendants issued a press release announcing Biopure's

financial results for the second fiscal quarter ended April 30, 2003. For the quarter, defendants

reported a net loss of $0.35 per share, compared with a net loss of $0.49 for the corresponding

period in 2002. Regarding the FDA's pending approval of the Company's Hemopure BLA,

the press release, stated in pertinent part as follows:

> *Biopure is hopeful that in mid 2003 the FDA will complete its review and act on
> Biopure's biologic license application (BLA) to market Hemopure in the United
> States for the treatment of acutely anemic adult patients undergoing orthopedic
> surgery.* As part of this review, the agency has inspected the company's
> manufacturing and data-handling facilities and has audited its contract research
> partners and several clinical sites in the United States and South Africa. Biopure
> has responded to all questions raised by the FDA to date. [Emphasis added.]

32.    On June 16, 2003, defendants filed a Form 10-Q with the SEC confirming

the Biopure's results stated above. In addition, defendants stated, in relevant part, as follows:

> Research and development expenses continue to include amounts for support of
> the BLA review process. *These BLA support costs were $2,339,000 for the
> second fiscal quarter of 2003 and are expected to continue at approximately the
> same level until August 29, 2003, when the Company expects the FDA to act on
> the BLA.* If the FDA were to grant a marketing license at that time, this major
> project could be substantially complete for orthopedic surgery. Further, any FDA
> action in August could consist of requests for additional information rather than
> product approval, including a requirement to conduct additional pre-clinical or
> clinical trials. Moreover, an approval could be conditioned on the Company's
> agreement to conduct a "Phase IV", or post-marketing trial to collect additional
> data. Consequently, the amount of further expenditures on this major project after
> an FDA response cannot be estimated until we receive the response.
>
> *If the FDA grants marketing approval for Hemopure this calendar year, we
> anticipate that we would have material revenues from this project in fiscal 2004.*
> We do not anticipate that we will attain profitability, however, until we are able to

increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure. [Emphasis added.]

33.     On May 30, 2003, the defendants issued a press release announcing that

the FDA had notified Biopure that it will complete its review and act on the Company's BLA for

Hemopure by August 29, 2003. In the release, defendants stated in relevant part as follows:

Biopure submitted its BLA on July 31, 2002. Under FDA performance goals in the Prescription Drug User Fee Act (PDUFA III), the agency has up to 10 months from the submission date to review and act on the BLA, making the original action due date June 1, 2003. As part of the normal review process, Biopure has responded to FDA questions regarding the application. The agency has classified the latest responses submitted in mid-May 2003 as additional analyses of previously submitted data, which under FDA standard operating procedures automatically provides the agency up to three months beyond the original action due date to review the data. This type of action is not unusual-the last 11 standard BLAs accepted for review by the FDA have undergone a 13-month review.

In the release, defendant Moore commented on the FDA's review process in relevant part as

follows:

*We're very pleased with the FDA's progress in reviewing our application[.] We continue to work closely with the agency toward a final decision that will allow us to make Hemopure available as an alternative to red blood cell transfusion.* We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval. [Emphasis added.]

34.     On July 23, 2003, defendants issued a press release announcing that the

Company had completed a public offering of 3,083,000 shares of Biopure common stock, raising

$17.2 million in total proceeds.

35.     On August 21, 2003, Biopure issued a press release announcing its

financial results for the third fiscal quarter ended July 31, 2003. For the quarter, defendants

reported a net loss of $0.28 per share, compared with a net loss of $0.43 for the corresponding

period in 2002. With respect to the FDA's review of the Company's Hemopure BLA,

defendants stated as follows, in relevant part:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

36.    On September 15, 2003, defendants filed with the SEC a Form 10-Q

reiterating Biopure's results as stated above. In addition, defendants stated in relevant part as

follows:

> These BLA support costs were $2,170,000 for the third fiscal quarter of 2003 and are expected to continue at approximately the same level until the Company completes its response to the letter received from the FDA on July 30, 2003. The next FDA action, following our response, could consist of a product approval or requests for additional information, including a requirement to conduct additional pre-clinical or clinical trials. Moreover, an approval could be conditioned on the Company's agreement to conduct a "Phase IV", or post-marketing, trial to collect additional data. Consequently, the amount of further expenditures on this major project after an FDA action cannot be estimated until we receive the response.
>
> ***We anticipate material revenues from this project within one year if the FDA grants marketing approval for Hemopure.*** We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure. [Emphasis added.]

37.    On October 30, 2003, Biopure issued a press release in which it

announced its plans to respond to the FDA's questions regarding its BLA for Hemopure by June

30, 2004. The release stated that the Company had adjusted its operating plan to reduce

expenses and conserve cash while it completes its written response to the FDA. The press

release stated in pertinent part as follows:

During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

Defendant Moore commented, in relevant part, as follows:

In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions[.] We view the Agency's questions as a "roadmap" to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the United States as expeditiously as possible.

      38.    The statements referenced above in ¶¶ 29-37 were each materially false

and misleading when made because they failed to disclose certain existing material facts,

including, *inter alia*:

      (a)    that Biopure had been notified by the FDA, as early as March 2003 that

the Company's clinical trials of Hemopure for trauma applications had been suspended as a

result of "safety concerns" arising from adverse clinical data reviewed by the FDA in connection

with the Company's BLA for the use of Hemopure in anemic patients undergoing orthopedic

surgery;

      (b)    that as a result of the FDA's suspension of the Company's clinical trials of

Hemopure, FDA approval of Biopure's BLA for commercial marketing of Hemopure in the

United States was in serious jeopardy, and could not have occurred, if at all, earlier than late

2004; and

      (c)    based on the foregoing, defendants' opinions, projections and forecasts

concerning the Company financial condition were lacking in a reasonable basis at all times.

14

## THE TRUTH IS REVEALED

39.    On December 24, 2003, after the market closed, defendants revealed in a

press release that Biopure had received a Wells Notice from the SEC, indicating the staff's

preliminary decision to recommend that the Commission bring civil injunctive proceedings

against the Company.  Defendants stated that they believed the notice to be related to the

Company's lack of disclosures to the public regarding its communications with the FDA about

the trauma study protocol and the BLA for Hemopure.  Defendants disclosed, in the same

release, that the FDA had halted further clinical trials of Hemopure due to safety concerns,

thereby jeopardizing the marketability of the drug. In the release, defendants stated, in relevant

part, as follows:

> Biopure submitted the trauma protocol for a Phase II clinical trial of Hemopure
> for the treatment of hemorrhagic shock casualties in the hospital setting, where
> red blood cell transfusions are available. The FDA placed this trauma protocol
> under a new IND that is separate from the company's previous IND and its BLA
> to market Hemopure for the treatment of acutely anemic adult patients undergoing
> orthopedic surgery and for the elimination or reduction of red blood cell
> transfusions in these patients. The protocol sought to administer up to 15 units of
> Hemopure, a proposed dosage that was 50 percent higher than administered in
> previous clinical trials.
>
> After the in-hospital trauma protocol was submitted to the FDA and the new IND
> was assigned, the Agency placed a clinical hold on the proposed trauma trial due
> to safety concerns. The FDA referred to a review of adverse event data from the
> company's Phase III orthopedic surgery trial, which was submitted in the BLA.
> The data from that Phase III trial has been previously presented at medical
> meetings.
>
> In May 2003, Biopure responded to the FDA's clinical hold and also filed the
> response as a BLA amendment because it discussed data previously submitted
> with the BLA. That amendment resulted in the FDA extending its BLA review
> period up to 90 days, as previously announced on May 30, 2003. The Agency also
> requested three additional pre-clinical animal studies of Hemopure in conscious
> swine to address its concerns regarding high-volume administration. After the
> company's responses, the FDA has twice declined to lift the clinical hold, most
> recently in a letter dated July 30, 2003.

The press release also indicated that regulatory approval of the Hemopure BLA would be
postponed at least until the second-half of 2004:

> A Biopure-requested meeting has been scheduled with the FDA on January 6,
> 2004, to discuss the BLA. If there are significant developments at or following
> this meeting, the company intends to report them promptly. Biopure still expects
> to respond to the questions in the FDA's complete response letter by June 30,
> 2004.

      40.    The market's reaction to defendants' disclosures was swift and dramatic.

On December 26, 2003, the first trading day following Biopure's announcements, the price per

share of Biopure common stock fell over 13.8% from its previous trading day's closing price to

close at $2.43 per share on unusually high trading volume of over 3 million shares.

      41.    On January 8, 2004, defendants issued a press release reporting the results

of the Company's meeting with the FDA on January 6, 2004, during which the FDA expressed

further concern with Hemopure's safety and effectiveness. In the release, defendants stated, in

relevant part, as follows:

> During the meeting the FDA expressed concerns about the current BLA based on
> safety and efficacy questions, beyond those cited in the complete response letter,
> arising from the Phase III orthopedic surgery trial. The Agency agreed to a
> continuing dialogue on these and other aspects of the BLA through meetings in
> advance of the company's planned reply to the complete response letter. Biopure
> continues to believe Hemopure is both safe and effective for the indication
> described in the BLA.

> The FDA asked Biopure to provide, for its evaluation of the BLA, the results of
> three previously requested preclinical studies. The FDA said that these studies are
> also a prerequisite for further U.S. clinical trials. Biopure has already submitted
> the protocols for these preclinical studies, and the Agency agreed to review them
> promptly. The studies are designed to assess the product's effect on tissue
> perfusion, tissue oxygenation and volume hemodynamics (colloidal effect) at high
> dosages (up to 70 percent blood replacement) in conscious swine. The company
> believes it can complete these animal studies within approximately six months
> after the FDA and the company agree on the protocols.

> Following its review of these preclinical studies and Biopure's responses to the
> issues raised by the FDA in its complete response letter and during the January